**Case No. 14-12977**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

JASON M. COX, ESTEVAN CASTILLO,
LEO THOMAS TOOKES, JR., and ALESIA LEWIS-VINSON,

Plaintiffs/Appellees,

v.

COMMUNITY LOANS OF AMERICA, INC., et al.,

Defendants/Appellants.

---

Rule 23(f) Appeal from a Class-Certification Order
of the United States District Court for the Middle District of Georgia

---

**BRIEF OF APPELLEES**

---

Roy E. Barnes
John R. Bevis
J. Cameron Tribble

BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, Georgia 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373

*Attorneys for Plaintiffs/Appellees*

## CERTIFICATE OF INTERESTED PERSONS
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs agree with the Corporate Disclosure Statement provided by

Defendants.

## <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction over this dispute under the Military

Lending Act of 2007, 10 U.S.C. § 987 *et seq.*, and 28 U.S.C. §§ 1331 and 1337.

This Court has jurisdiction over this Appeal under 28 U.S.C. § 1292(e).

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs join in the request for oral argument solely on the basis that the issues presented in this Appeal—application of the Military Lending Act to the facts and loan transactions implicated by this case—create a matter of first impression.

Plaintiffs disagree with the remainder of Defendants' statement concerning the necessity of oral argument as it contains argumentative and self-serving assertions by a losing party in the court below. The issues respecting the district court's decision to grant class certification and its obligations under the Federal Rules of Civil Procedure do not present "unsettled legal issues" and the district court's order is not "nebulous or opaque." (Br. of Appellants i).

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS  AND
CORPORATE DISCLOSURE STATEMENT ........................................ i

STATEMENT OF JURISDICTION........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................. iii

TABLE OF CITATIONS ...................................................................... vi

TABLE OF RECORD REFERENCES IN THE BRIEF ……………………….. xii

STATEMENT OF THE ISSUES............................................................ xii

STATEMENT OF THE CASE.................................................................3

STATEMENT OF FACTS .....................................................................10

SUMMARY OF THE ARGUMENT .....................................................19

ARGUMENT AND CITATION TO AUTHORITY .............................21

   I.   The district court properly found good cause existed to allow
       Rule 23(b)(3) certification .............................................................27

  II.  A private right of action exists under the MLA .............................31

      A. Private right of action jurisprudence .......................................31

      B. The 2007-MLA provides for a private right of action..............32

         1.   Giving the power to void a contract
             creates a private right of action ........................................32

         2.   The savings clause recognizes the creation
             of remedies and rights .......................................................34

         3.   The arbitration clause reinforces the private right of action ..............36

      C. No comprehensive enforcement scheme exists ........................37

D. The legislative history supports a private right of action .........................37

III. The district court identified common claims, issues, and defenses ..............39

IV. Commonality and typicality ...........................................................42

V.  Express requirements of Rule 23(b)(3) .............................................48

A. Predominance........................................................................49

B. Superiority ..........................................................................53

## <u>TABLE OF CITATIONS</u>

<u>**Cases**</u>

<u>Abby v. Paige</u>,

    10-23589-CIV, 2013 WL 141145 (S.D. Fla., Jan. 11, 2013) ..............................51

<u>Alexander v. Sandoval</u>,

    532 U.S. 275, 288, 121 S. Ct. 1511 (2001) ............................................... 31, 32, 37

<u>Allapattah Servs. v. Exxon Corp.</u>,

    333 F.3d 1248 (11th Cir. 2003) ...........................................................................52

<u>Am. Airlines v. Wolens</u>,

    513 U.S. 219, 115 S. Ct. 817 (1995).....................................................................53

<u>Am. First Fed., Inc. v. Lake Forest Park, Inc.</u>,

    198 F.3d 1259 (11th Cir. 1999) ...........................................................................34

<u>Blum v. Bacon</u>,

    457 U.S. 132, 102 S. Ct. 2355 (1982)...................................................................40

<u>Bridge v. Phoenix Bond & Indem. Co.</u>,

    553 U.S. 639, 128 S. Ct. 2131 (2008)............................................................. 49, 52

<u>Cannon v. Univ. of Chicago</u>,

    441 U.S. 677, 99 S. Ct. 1946, 1 (1979).................................................................32

<u>Cappetta v. GC Servs. Ltd. P'ship</u>,

    654 F. Supp. 2d 453 (E.D. Va. 2009) ...................................................................51

Cnty. of Monroe, Fla. v. Priceline.com, Inc.,

    265 F.R.D. 659 (S.D. Fla. 2010)..............................................................52

Cox v. Community Loans of Am., Inc.,

    No. 12-11599, 2013 WL 786 1816 (11th Cir. Jan 18, 2013) ................................6

DeHoyos v. Allstate Corp.,

    240 F.R.D. 269 (W.D. Tex. 2007) ..........................................................34

Dunbar v. Google, Inc.,

    5:12-CV-003305-LHK, 2012 WL 6202797 (N.D. Cal. Dec. 12, 2012) ..............30

Gebser v. Lago Vista Indep. Sch. Dist.,

    524 U.S. 274, 118 S. Ct. 1989 (1998)......................................................34

George v. Gen. Motors Corp.,

    7:05-CV-1482, 2007 WL 2973589 (N.D.N.Y. Oct. 9, 2007)..............................30

Gonzalez v. Codilis & Associates, P.C.,

    03 C 2883, 2004 WL 719264 (N.D. Ill. Mar. 31, 2004)......................................51

Gordon v. Pete's Auto Serv. of Denbigh, Inc.,

    838 F. Supp. 2d 436 (E.D. Va. 2012) ..................................................36

Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.,

    420 F.3d 1317 (11th Cir. 2005) ..........................................................29

Hines v. Widnall,

    334 F.3d 1253 (11th Cir. 2003) ........................................................2, 42

In re Checking Account Overdraft Litig.,

  286 F.R.D. 645 (S.D. Fla. 2012)............................................................53

In re Mexico City Aircrash of October 31, 1979,

  708 F.2d 400 (9th Cir. 1983) ...............................................................35

Jimenez v. Miami-Dade Cnty.,

  11-23131-CIV, 2013 WL 214673, at *7 (S.D. Fla., Jan. 18, 2013) ....................36

Klay v. Humana, Inc.,

  382 F.3d 1241 (11th Cir. 2004) .................................................. 49, 54

Liese v. Indian River Cnty. Hosp. Dist.,

  701 F.3d 334 (11th Cir. 2012) ............................................................34

Link v. Wabash R.R. Co.,

  370 U.S. 626, 82 S. Ct. 1386 (1962)......................................................29

Linscott v. Vector Aerospace,

  CV-05-682-HU, 2006 WL 240529 (D. Or., Jan. 31, 2006) ................................36

Love v. Delta Air Lines, Inc.,

  310 F.3d 1347 (11th Cir. 2002) ...........................................................37

Mullen v. Treasure Chest Casino, LLC,

  186 F.3d 620 (5th Cir. 1999) .............................................................56

Or. Natural Res. Council v. U.S. Forest Serv.,

  834 F.2d 842 (9th Cir. 1987) .............................................................35

Prado–Steiman ex rel. Prado v. Bush,

  221 F.3d 1266 (11th Cir. 2000) ...............................................................2

Robinson v. Tex. Auto. Dealers Ass'n,

  387 F.3d 416 (5th Cir. 2004) ................................................................55

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,

  601 F.3d 1159 (11th Cir. 2010) ...................................................... 47, 54

Sahyers v. Prugh, Holliday & Karatinos, P.L.,

  560 F.3d 1241 (11th Cir. 2009) .............................................................28

Scott v. Family Dollar Stores, Inc.,

  733 F.3d 105 (4th Cir. 2013) ................................................................30

Shahriar v. Smith & Wollensky Rest. Gp. Inc.,

  659 F.3d 234 (2d Cir. 2011) ........................................................... 40, 49

Shroder v. Suburban Coastal Corp.,

  729 F.2d 1371 (11th Cir. 1984) ..............................................................2

Sikes v. Teleline, Inc.,

  281 F.3d 1350  (11th Cir. 2002) ...........................................................52

Singer v. AT&T Corp.,

  185 F.R.D. 681 (S.D. Fla. 1998)...........................................................53

Sosa v. Airprint Sys., Inc.,

  133 F.3d 1417 (11th Cir. 1998) ............................................................29

Stirman v. Exxon Corp.,

  280 F.3d 554 (5th Cir. 2002) ........................................................... 51, 56

Sullivan v. DB Invs., Inc.,

  667 F.3d 273 (3d Cir. 2011) ...................................................................56

Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,

  444 U.S. 11, 100 S. Ct. 242 (1979)................................................ 31, 32, 33, 34, 36

United States v. Jordan,

  915 F.2d 622 (11th Cir. 1990) ...............................................................38

Upshaw v. Ga. Catalog Sales, Inc.,

  206 F.R.D. 694 (M.D. Ga. 2002)..........................................................54

Vega v. T-Mobile USA, Inc.,

  564 F.3d 1256 (11th Cir. 2009) .............................................. 49, 52, 55

Weber v. Finker,

  554 F.3d 1379 (11th Cir. 2009) ..............................................................2

**Statutes**

10 U.S.C. § 987 (2007) ................................................................ 22, 33, 34

10 U.S.C. § 987(f)(5) (2013) ....................................................... 25, 26, 27

33 U.S.C. § 1365(e) (1987)....................................................................35

49 U.S.C. § 1506 (1976) ........................................................................35

**Rules**

Fed.R.Civ.P. 15(a)..........................................................................28

Fed.R.Civ.P. 16(b)(4)..................................................................... 28

Fed.R.Civ.P. 23 ...................................................................... *passim*

**Regulations**

12 C.F.R. § 226.1(b) .....................................................................25

32 C.F.R. § 232.3 ................................................................. 3, 24, 25

72 Fed. Reg. 50590 ........................................................................37

72 Fed. Reg. 50580-01 ...................................................................38

**Other Authorities**

2 NEWBERG ON CLASS ACTIONS § 4:14 (4th ed. 2002) ...........................34

2 NEWBERG ON CLASS ACTIONS § 4:54 (5th ed.) ...................................52

3 NEWBERG ON CLASS ACTIONS § 7:33 (5th ed.) ...................................31

7A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 1779 (3d ed.)...........................54

THE CTR. FOR RESPONSIBLE LENDING & THE CONSUMER FED. OF AM.,

   Car Title Lending: Driving Borrowers to Financial Ruin (April 14, 2005).........22

## TABLE OF RECORD REFERENCES IN THE BRIEF

| Docket No. | | Brief Page No. |
|---|---|---|
| 1 | Complaint | 6 |
| 8 | Motion to Dismiss by Defendants | 5, 6 |
| 20 | Motion for Preliminary Injunction by Plaintiffs | 6 |
| 32 | Motion to Dismiss Amended Complaint by Defendants | 5, 6 |
| 33 | Response to Motion to Dismiss (re Doc #32) by Plaintiffs | 6 |
| 34 | Response to Motion for Preliminary Injunction (re Doc. #20) by Defendants | 6 |
| 39 | Order denying Motion to Dismiss | 6 |
| 55 | Transcript of Proceedings held on 03/02/2012 | 5 |
| 62 | Protective Order Signed By Judge Land | 10 |

| 66 | Joint Motion for Extension of Time to File Two of Plaintiffs' Deadlines Under the Case Management Order | 7 |
|---|---|---|
| 68 | Joint Motion for Extension of Time to File Meeting Certain Deadlines Under the Case Management Order | 7 |
| 100 | Motion for Extension of Time to File Response to Second Amended Complaint and to Modify Remaining Deadlines Under the Case Management Order in Light of the Addition of Parties by Defendants | 7 |
| 102 | Motion For Direction on Discovery Pertaining to Identifying Potential Members of the Putative Class of Active-Duty Customers by Defendants | 7 |
| 103 | Response to Motion for Direction (re Doc. #102) by Plaintiffs | 7, 57 |
| 110 | Reply to Response (Doc. 102) by Defendants | 7 |
| 111 | Declaration of Steven T. Woods | 7 |
| 115 | Redacted Memorandum in Support of Motion for Class Certification | 10, 18 |
| 122 | Exhibits (36, 38, 40 & 41) Plaintiffs' Appendix | 38, 57 |

| 126 | UNREDACTED Motion and Memorandum of Law In Support of Class Certification | 3, 6, 10, 21-22, 47 |
|---|---|---|
| 127 | Joint Motion to Stay Case-Management Order Pending Identification of Putative Class Members and Continued Settlement Discussions | 7, 8, 57 |
| 128 | Order terminating  Motion direction on Discovery | 57 |
| 131 | Joint Motion For Continuation of Stay | 7, 8, 58 |
| 134 | Status Report by Parties | 7 |
| 139 | Motion for Partial Summary Judgment by Defendants | 8 |
| 145 | Response to Motion For Summary Judgment (Doc. #139) by Plaintiffs | 8 |
| 150 | Motion to Compel Discovery from Defendants | 8 |
| 151 - 164 | Memorandum in Support of Motion to Compel Discovery by Plaintiffs | 8 |
| 166 | Response Filed by Defendants | 8 |

| 169 | Deposition of Estevan Castillo taken on 09/13/2013 | 7 |
|---|---|---|
| 170 | Deposition of Jason Cox taken on 09/28/2013 | 6 |
| 171 | Deposition of Alesia Lewis-Vinson taken on 09/20/2013 | 6 |
| 172 | Deposition of Leo Tookes taken on 09/11/2013 | 6 |
| 174 | Response to Motion to Compel (Doc. 151) by Defendants | 8 |
| 176 | McGimsey's 9-11-2013 Supplemental Report) to Plaintiff's Reply in Support of Class Certification | 54 |
| 180 – 181 | Motion for Permanent Injunction and Memorandum in Support | 8 |
| 184 | Motion for Summary Judgment by Defendants | 8, 46 |
| 187 | Transcript of Proceedings held on 11/20/2013 | 9, 28, 30, 42, 58 |
| 191 | Memorandum in Support by Plaintiffs | 54 |
| 204 | Order denying Motion to Certify Class | 3-4,9,29, 37,39-40, 43-45, 47-51, 55-56, 58-59 |
| 205 | Third Amended Complaint | 3 |

## **STATEMENT OF THE ISSUES**

Plaintiffs/Appellees contend that the issues presented by this Appeal involve two straightforward inquiries.

**I.** Does the Military Lending Act of 2007 apply to the transactions at issue in this case, and if so, does it contain an implied private right of action for Servicemembers and their dependents that enables them to file suit to recover consequential and punitive damages resulting from non-compliant loans?

**II.** Did the district court abuse its discretion under the Federal Rules of Civil Procedure in granting class certification under to Rule 23(b)(3)?

1

## STANDARD OF REVIEW

The standard of review applicable to a district court's interpretation of a federal statute is *de novo.* Weber v. Finker, 554 F.3d 1379, 1382 (11th Cir. 2009). A district court's decision whether or not to certify a class under Rule 23 of the Federal Rules of Civil Procedure is reviewed for abuse of discretion. See Prado–Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1278 (11th Cir.2000). As long as the district court's reasoning stays within the parameters of Rule 23's requirements for certification of a class, the district court decision will not be disturbed. See Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1374 (11th Cir.1984). When this court reviews class certification decisions, the fact that this Court would grant or deny class certification is irrelevant. Hines v. Widnall, 334 F.3d 1253, 1255 (11th Cir. 2003).

## STATEMENT OF THE CASE

This action challenges Defendants' practice of making "title loans", "title pledges" or "title pawns" (by whatever name they ascribe to the transactions), to active duty Servicemembers and their dependents in violation of the Military Lending Act ("MLA"), a federal law specifically enacted to protect members of the military from potentially abusive lending products and practices.  Plaintiffs challenged to the uniform and systematic practices used by Defendants to make virtually identical title loans in seventeen different states (and Puerto Rico) through 900+ different storefront locations.  (Doc. 205).  Because the evidence in this case overwhelmingly demonstrated that the transactions at issue in this case are substantively the same—i.e. that they are "'**[c]losed-end [consumer] credit with a term of 181 days or fewer that is secured by the title to a motor vehicle**'" (Doc. 204 – Pg. 15) (quoting 32 C.F.R. § 232.3(b)(1)(ii), (b)(2)(ii) (2007))—and because each and every transaction was initiated, completed, memorialized, processed, tracked, and collected in exactly the same manner through uniform and systematic processes (Doc. 126), the district court properly certified the case as a class action under Rule 23(b)(3), defining the class as follows:

> All covered members of the armed services and their dependents who, between October 1, 2007 and January 2, 2013, entered into, rolled over, renewed, refinanced, or consolidated a vehicle title loan by any means with a Defendant that imposed an annual percentage rate of greater than 36 percent and required the title of a vehicle as security for the obligation for a term of 181 days or less. For purposes of this

3

class definition, a covered member of the armed services is a member of the armed forces who is (A) on active duty under a call or order that does not specify a period of 30 days or less; or (B) on active Guard and Reserve Duty.

A dependent of a covered member means the covered member's spouse, child, or an individual for whom the member provided more than one-half of the individual's support for 180 days immediately preceding the extension of consumer credit.

For purposes of this class definition, the phrase "vehicle title loan by any means" includes vehicle title loans, vehicle title pawns, and vehicle title pledges, and the phrase "covered members" does not include individuals who executed a statement at the time of the transaction indicating that they were not affiliated with the military.

(Doc. 204 – Pg. 46).

Summarized, the exemplar transactions of the Named Plaintiffs memorialize the following particulars:

- ***Staff Sergeant Jason Cox (United States Army):*** $3,000 "financed" on July 2, 2010 for 30 days at an "Annual Percentage Interest Rate" of 146 percent, secured by the title to his 2002 Dodge Durango, the "Maturity Date" of which was repeatedly deferred through June 30, 2011. The Alabama Title Loans, Inc., storefront used to process the transactions was AL-0526 in Phenix City, Alabama.

- ***Master Sergeant Estevan Castillo (United States Army):*** $618 "financed" on November 23, 2010 for 30 days at an "Annual Percentage Rate" of 152.08 percent, secured by the title to his 1994 Chevrolet Camaro, the "Maturity Date" of which was repeatedly deferred through November 1, 2011. The Georgia Auto Pawn, Inc. storefront used to process the transactions was GA-0008 in Columbus, Georgia.

- ***Sergeant Leo Thomas Tookes, Jr. (United States Marines):*** $1,500 "financed" on December 20, 2010 for 30 days at an

4

"Annual Percentage Rate" of 152.08 percent, secured by the title to his 1991 Jeep Grand Cherokee, the repayment of which was made on January 19, 2011.  $2,000 "financed" on March 9, 2011 for 30 days at an "Annual Percentage Rate" of 152.08 percent, secured by the title to his 1991 Jeep Grand Cherokee, the "Maturity Date" of which was repeatedly deferred through January 20, 2012.   The Georgia Auto Pawn, Inc. storefront used to process the transactions was GA-0310 in Kingsland, Georgia.

- **Alesia Lewis-Vinson (United States Army Spouse):**  Beginning on December 10, 2007 through March 1, 2012, Plaintiff Vinson entered into or renewed numerous vehicle title loans, with each loan having a 30 day "Maturity Date."   Each loan imposed an "Annual Percentage Rate" of 152.08 percent and was secured by the title to her 1999 Mitsubishi Galant.  The Georgia Auto Pawn, Inc. storefront used to process the transactions is GA-0012 in Columbus, Georgia.[1]

Although Defendants acknowledged in discovery that the same uniform and systematic practices were used to make virtually identical loans in all eighteen jurisdictions implicated in this action[2] (see fact discussion, *infra*), they argue the name given to them under state law (i.e. "title loan" vs. "title pledge" vs. "title pawn") transforms the transactions into something that the MLA cannot reach. (Doc. 8, 32, 55).

---

[1] Plaintiffs' loan agreements are included in Doc. 126 (Filed Under Seal) in the Appendix in Support of Class Cert., Ex. 20-23 (Cox); Ex. 24, 26, 27 (Castillo); Ex. 25, 27 (Tookes); and Ex. 41 (Lewis-Vinson).

[2] The scope of this case implicates "vehicle title loans" made in Alabama, Arizona, Delaware, Georgia, Idaho, Illinois, Louisiana, Mississippi, Missouri, Nevada, New Hampshire, New Mexico, Puerto Rico, South Dakota, Tennessee, Texas, Utah and Wisconsin.

## Procedural History & Efforts to Identify Potential Class Members

Plaintiffs initially filed this case on Veteran's Day, November 11, 2001, asserting that Count II (Violation of the MLA) & Count VI (Declaratory and Injunctive Relief to Benefit All Covered Members of the Armed Forces) warranted class certification under 23(b)(2) without having the benefit of any formal discovery. (Doc. 1). The Defendants immediately sought dismissal of the case (Doc. 8, 32). Plaintiffs opposed dismissal (Doc. 33) and sought a preliminary injunction to preserve the status quo of the putative class members (Doc. 20), which Defendants opposed (Doc. 34). The district court denied Defendants' Motion to Dismiss. (Doc. 39). Although Staff Sergeant Cox's vehicle had already been repossessed before litigation commenced, the district court granted a preliminary injunction prohibiting Defendants from repossessing any vehicles from the remaining Named Plaintiffs. (Doc. 39 - Pg. 20-21).[3]

Following the dismissal of the first appeal, the court permitted the parties to engage merits based discovery, which revealed *inter alia* that when the MLA was passed in 2007, Defendants purportedly stopped making vehicle title loans to active duty military Servicemembers and their dependents in some states but not in others. Discovery continued, including depositions of the Defendants (Doc. 126,

_____

[3] Because Defendants consented to entry of the preliminary injunction, their first attempt at a direct appeal to this Court was dismissed for lack of jurisdiction. Cox v. Community Loans of Am., Inc., No. 12-11599, 2013 WL 786 1816 (11th Cir. Jan 18, 2013).

6

Exs. 48, 50, 51), the Named Plaintiffs (Doc. 169-172), and the experts (Doc. 126,

Ex. 49).  As required by the case scheduling order, on February 19, 2013, Plaintiffs

filed a motion for class certification under Rule 23(b)(2) (Doc. 126), submitting

extensive evidence and documentation in support (Doc. 126, Ex. 2-52).

Again with the parties' consent (before Defendants were required to respond

to Plaintiffs' Motion for Class Certification), the case scheduling order was

modified or stayed multiple times (Docs. 66, 68, 100, 127, 131, 134) in order to

allow the parties to concentrate their efforts on identifying potential class members

and finding an amicable resolution of the case.  As a condition for the various

stays, and with the district court's continued oversight and repeated involvement

(Doc. 102, 103, 110, 111), the parties agreed to: (a) identify on a state-by-state

basis the products and lines of business implicated by the MLA; (b) determine an

effective and practical method for identifying potential members of the putative

class; and (c) calculate the potential exposure in the event Plaintiffs prevailed in

the action.  (Doc. 68 – Pg. 2 ¶3).

As a result of these efforts, the parties reported to the district court that they

had "jointly developed the most efficient and practical means of identifying those

borrowers potentially covered by the MLA" by agreeing that Defendants could

"upload [their] customer database for all jurisdictions implicated by this action to

the Servicemembers Civil Relief Act ("SCRA") website ("SCRA database") to

electronically identify the transactions of any past or present active duty Servicemembers from October 1, 2007." (Doc. 127 – Pg. 3, ¶5). Because the SCRA database does not contain information pertaining to servicemember dependents, the parties agreed it was practical to identify potential dependents "who qualify as 'covered borrowers' within the meaning of the MLA . . . ." (Id.). This electronic comparison produced approximately 2,461 active-duty servicemembers who engaged in a title loan, title pledge, or title pawn transaction with any of Defendants in the eighteen jurisdictions at issue in this civil action, and the electronic searches of pertinent terms in Defendants' electronic database produced approximately 2,597 potential dependent borrowers. (Doc. 131 – Pg. 1-2, ¶¶2(a), (b)).

When the settlement negotiations failed, the scheduling order resumed, Defendants filed two summary judgment motions; one in September 2013 (Doc. 139), with Plaintiffs' response (Doc. 145), and another in November 2013 (Doc. 184). Defendants also filed an opposition to class certification (Doc. 166). Plaintiffs filed a motion to compel production of certain loan files segregated by Defendants (Doc. 150-164, 174) and a motion for declaratory and injunctive relief (Docs. 180, 181). A hearing was conducted on November 20, 2013 regarding summary judgment, class certification, and Plaintiffs' motion to compel. (Doc. 185).

8

Noting that this case was, procedurally, at a different posture than cases typically involving only the preliminary question of whether class certification was appropriate (without merits-based discovery having been completed), with the consent of Defendants, the district court agreed to defer its rulings on summary judgment and class certification, and ordered the parties to file supplemental briefing on the propriety of class certification under Rule 23(b)(2) and/or 23(b)(3). (Doc. 187 - Pg. 98-99).  On March 24, 2014, the district court entered the forty-seven page order ("Order") now on appeal.  (Doc. 204).

## STATEMENT OF FACTS

Plaintiffs disagree that Defendants' two-page Statement of Facts adequately presents the facts pertinent in this appeal and those that were considered by the district court when deciding to grant class certification status in this case. Defendants' actual practices being challenged in this case are shrouded in much secrecy.  This fact is borne out by Defendants' designation that most of the facts supporting the elements of class certification were subject to confidentiality and, pursuant to a Protective Order entered in the case (Doc. 62), had to be filed under seal pursuant to the terms of the Protective Order entered in this case.  (Doc. 126). In fact, of the appellate record designations made by Defendants, none of the documents filed under seal were designated or noted, and few, if any, of the "restricted Documents" contained in the record have been designated by Defendants.  Accordingly, Plaintiffs request this Court to review and consider the *unredacted* version of the facts that were presented to the district court in support of class certification.  (Doc. 126, *Unredacted* version of Memorandum In Support of Class Certification (Filed Under Seal) and supporting Appendix (Doc. 126-1— 126-52).

For the purposes of this brief, the *redacted* version of the facts (as designated by Defendants in Doc. 115) is what Defendants would have this Court

consider as the pertinent facts of the case, omitting key components of what the evidence shows:

### The Uniform Business Operations at Issue are Governed and Controlled by the Same Board Members, Management Team

Defendant[Appellant] Community Loans of America, Inc. ("CLA") has been in operation for nearly two decades and has formed 150 or so separate corporate entities in 34 different states, all of which operate from CLA's corporate address located at 8601 Dunwoody Place, Suite 406, in Atlanta, Georgia.  (███████████ ███████████████; **APP. EX. 28**, List of CLA Subsidiaries/Affiliates - By State).  Of the 22 corporate Defendants named in this action, either Robert Reich (CEO & President) and/or Terry E. Fields (CFO, Secretary & Treasurer) serve as the sole officers.  (**APP. EX.** ████████, ███████████████████ ████████████████).  ████████████████████████ ████████████████████████████████████████████ ███████████████████████████ ████████████████████ ████████████████████████████████ ██████████ ███████████████████████████████.

(Reich Dep. at47, 49-50, 59, 62, 140; Fields Dep. at 25-26, 64, 70-71).

---

4 ████████████████████████████ (Reich Dep. 58)
5 ██████████████████████. (Id. p. 83).

**The Transactions At Issue Are Processed and Controlled By Unified
Computer Systems and Business Rules**

The deposition of Defendants' first corporate representative, Steven T.

Woods, Director of Business Application for CLA establishes that all the

transactions at issue in this case are controlled and processed by an elaborate and

unified computer system, known as "ELMS" (Electronic Loan Management

System)   First, the corporate office of CLA provides IT services to all of

subsidiaries and affiliates.  (Woods Dep., at 36).  Operationally, CLA's

computerized system is ████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████.  Thus, CLA's

computerized system ████████████████████████████

████████████████████████████████████

████████████████████.  (**APP. EX. 36**, CLA Business Rules by

state)

CLA provides management services, which include "most corporate

functions" such as "legal, accounting, [and] marketing."  (Woods Dep. at 36;

████████████████████).  Woods testified that the various branches "depend

on CLA to provide technology services and other corporate functions."  (Woods

Dep. at 39).  These technology services include a loan processing system which is

12

uniform across the country.  CLA developed and maintains the data and software for operations across 900 locations in approximately 25 states.  (Id. at 15; cf. Am. Compl. Ex. A).  This loan processing system was first implemented in 2004 and was completely operational in all states before October 1, 2007, the effective date of the MLA.  (Id. at 88.)  The local branches have access to the same information through their local computer system and individual workstations.  (Id. at 28-29.) Such information is housed in data centers that operate alternatively in either

███████████████.  (Id. at 29.)  ELMS "can be adjusted to control the behavior of those products" depending of the law of the state for each branch location.  (Id. at 49.)  Woods testified that "controlling the behavior of products" meant "how the system is processing them and implementing them and tracking them."  (Id.)

Besides the same the computer system being used, the same process applies in initiating and processing the transactions at the 900+ storefront locations operated by CLA.  For instance, when a customer visits a branch location, the customer provides personal information which is input into the local computer and transmitted to CLA's system through the internet.  ███████████████████

██████████████████████████████████████████████████████ (Id. at

78.) ███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

13

████████    (Id. at 71.)  Each different storefront utilizes virtually identical

equipment to initiate, process and track any loan.  (Id. at 120, 130.)  Regardless of

the state where the transaction is initiated, standardized forms completed by a

customer closely correlates with the data fields contained in the computer system.

(Id. at 73; see also **APP. EX. 9 & 10**).  ████████████████████

████████████████████████████████

████████████████████  (Id. at 74.)  ████████████████

████████████████████████  (Id. at 75.)  ████

████████████████████████████████

████████  (Id. at 122.)  Additionally, the computerized system  ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████  (Id. at 82.)  CLA also uses ██

████████████████████████████████

████████████████████.  (Id. at 124-25.)

        Each loan is given a unique computer generated number based on the

standardized information and fields printed in the loan agreement.  (Id. at 101.)

For example, an account number bearing the designation "TL-AL0001-061021-

3445-03" means something specific with the CLA processes:  The "**TL**" means

████████████ "**AL0001**" reflects ████████████████████████

████████████████; "[**061021**] would be the ████████████████

████████████████████████; "**3445**" would be ████████████████

████████████████████████; and the final series of the account

number "**03**" refers to ████████████████████████████████

████████████████████████. (Id. at 103.)  Likewise, an account number

bearing the designation "TL-AZ0949-081001-0257-01" would indicate ██

████████████████████████████████████████████████████

████████████████████████. (Woods Dep. at151-52; **APP. EX.**

**14,** Exemplar Loan Agreements.)

      CLA also uses the same accounting or status codes to track the day-to-day

status of each loan. ████████████████████████████████. (**APP. EX.**

**10**.)  The computer system records and tracks information such as ████████████

████████████████████████████████████████████. (Id.

at 106.)  The system also indicates whether ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. (Id. at 107-09.)  The system

also indicates whether a customer has ███████████████.[6]  After repossession

is complete, ███████████████████████████████████████████

███████████████ (Woods Dep. at 113), and Defendants ███████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████. (Id. at 110-11.)

          █████████████████████████████████████████. (Id. at

137.)  These reports █████████████████████████████████

███████████████████ (Id. at 158.)   The individual storefront locations

themselves do not ████████████████████████████████████

██████████████████████████████████████████

█████████████████████████ (Id. at 127.)  Further, none of the

branches ██████████████████████.  The centralized system does not ██████

████████████████████████████████████. (Id. at 128.)

Ultimately, when a loan is made, it is ██████████████████████████████

██████, whose signature appears on that loan proceeds check.  (Id.)  Simply put,

██████████████████████████████████████████

██████████████████████████████████████████

---

[6]    Regardless of the state where the transaction occurs, the Defendants ████████
███████████████████████████████ send to the same Florida
lawyer, which handles all the bankruptcies.  (**APP. EX. 31**; Fields Dep. at 109).

(<u>Id</u>. at 129.)  Woods agreed that 

(<u>Id</u>.)

CLA has operational manuals for using the system which "contains information that goes from the initial contact through the whole life of the account."  (<u>Id</u>. at 134.)  Although Woods denied that the manuals have not been used since 2005, (<u>Id</u>.; see also Woods Dep. at 72-73),

(Reich Dep. at 127-28; Fields Dep. at 44-45, 202-03).[7]

CLA's collections are also centralized.

(Woods Dep. at 139-40).  Regardless of which state the loan was made in,

; **APP. EX. 38**, Amnesty Letter to Castillo). There are of course practical advantages to this

(Woods Dep. at 124).

. (<u>Id</u>. at 123.)

---

[7]    When Defendants produce the Operations Manuals, Plaintiffs will supplement their appendix.

Defendants' incorporation of the redacted version of the facts as presented to the district court (Doc. 115) does not accurately portray the facts the district court actually considered when deciding class certification, and this Court should not accept Defendants' attempt to color and limit this Court's review of the facts on appeal.  The unredacted version of the facts should be considered as contained in Document 126, which was filed under seal.  According to Plaintiffs' understanding, all file materials, including those materials which were filed under seal, were electronically submitted to this Court on September 15, 2014.  See Docket Text entry, Sep. 15, 2014.  Document 126 and its exhibits are being reproduced in Appellee's Appendix appropriately designated as "Sealed Pursuant to Court Order."

18

## SUMMARY OF THE ARGUMENT

The district court correctly interpreted provisions of the MLA, correctly applied binding precedent, and correctly determined that the MLA of 2007 contains an implied private right of action for servicemembers and their dependents to bring suit in a court of law to recover consequential and punitive damages for the vehicle title loans that do not comply with the requirements of the MLA. The MLA is not merely a defensive measure that only permits it to be used if and when a lender initiates suit against servicemembers and their dependents to enforce the terms of non-compliant loans.

Applying the discretion vested to it in order to manage its own docket for the orderly and expeditious disposition of cases, the district court determined good cause existed to allow Plaintiffs to amend their complaint to bring a class under Rule 23(b)(3). Having adequately and appropriately considered and analyzed the common claims, issues and defenses raised in support of and in opposition to class certification, the district court did not abuse its discretion in certifying portions of this case (while excluding others) as a class action under Rule 23(b)(3).

With respect to predominance, the district court did not abuse its discretion because it exhaustively inquired into whether the various state law differences highlighted by Defendants would predominate over the common issues. The district court determined that the differences were immaterial. Further, this Court

19

has noted that class actions involving usury readily satisfy predominance requirements.  This Class is no different, as the damages are susceptible to efficient calculation.

Because the district court acted within the limits of its inherent powers and discretion, its decision to certify this case under Rule 23(b)(3) is due to be affirmed.

## ARGUMENT AND CITATION TO AUTHORITY

## HISTORY AND PURPOSE OF THE MILITARY LENDING ACT

In August 2006, Congress received a Department of Defense (DoD) report entitled, Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependants, which principally focused on short-term loan products that undermine military readiness and harm the morale of troops and their families. (Doc. 126, Ex. 39). The three products of concern for the DoD were payday loans, car title loans, and tax refund anticipation loans. (Id. at 4, 53). The report specifically addressed the untoward consequences that title loans have on Service members and their families and specifically requested that Congress:

> *Prohibit lenders from using . . . car title pawns as security for obligations.* These methods provide undue and coercive pressure on military borrowers and allow lenders more latitude in making loans without proper regard for the Service member's ability to repay. *They also place key assets at undue risk.*

(Id. at 7) (emphasis added). As it relates to their legal rights, the DoD expressly noted that:

> Servicemembers should maintain *full legal recourse* against unscrupulous lenders. Loan contracts to Servicemembers should not include mandatory arbitration clauses or onerous notice provisions[.]

(Id. at 7) (emphasis added). Congress agreed with the DoD's concerns and enacted the MLA.

21

The key provisions of the MLA that are at issue in this case: (1) prohibit creditors from imposing more than thirty-six percent (36%) annual percentage rate ("APR") in certain consumer credit transactions; (2) require creditors to make mandatory loan disclosures; (3) preempt inconsistent federal and state laws, rules and regulations; (4) prevent creditors from requiring the use of a title to a vehicle as security for the obligation; and (5) ban mandatory arbitration for disputes.  10 U.S.C. §§ 987(b)-(e).[8]  The MLA specifically directed the Secretary of Defense to prescribe regulations to carry out the purposes of the federal law and to define the types of credit to which the MLA would apply.  Id. at §§ 987(h)(1), (2)(D).[9]

In promulgating and implementing the regulations of the MLA, the DoD reviewed five credit products "that have, in general practice, terms that can be detrimental to military borrowers."  (Doc. 126, Ex. 44 – Pg. 5).  As specifically directed, DoD consulted with multiple governmental financial regulators (The

---

[8] The protections afforded under the MLA do not apply to the population at large and are not applicable to any transactions made to non-military members and their dependents.

[9] The Consumer Federation of America and the Center for Responsible Lending have long advocated that vehicle title loans are a form of predatory lending that traps borrowers in a cycle of debt and creates a high risk of unreasonably exposing an asset that is essential to the well-being of hard working American families— their vehicle.  For a discussion on the criticisms and concerns associated with vehicle title lending, see THE CTR. FOR RESPONSIBLE LENDING & THE CONSUMER FED. OF AM., Car Title Lending: Driving Borrowers to Financial Ruin (April 14, 2005), available at http://www.responsiblelending.org/other-consumer-loans/car-title-loans/research-analysis/rr008-Car_Title_Lending-0405.pdf.

Federal Trade Commission; The Board of Governors of the Federal Reserve

Systems; The Office of the Comptroller of the Currency; the Federal Deposit

Insurance Corporation; The Office of Thrift Supervision; The National Credit

Union Administration; and The Treasury Department), to delineate "clear lines"

around the definitions of covered consumer credit and the impacted creditors.

(Id.).  The authority delegated by Congress "allows the Department to determine

the scope and impact of the regulation, consistent with the provisions of the

statute," and "to focus these limitations on areas of greatest concern." (Id. at 7).

The DoD identified and characterized a number of practices "widely

acknowledged to be predatory" which "trap the borrower in a cycle of debt; and

leave the borrower in worse financial shape than when they initially contacted the

lender."

> These include, among other things, charging excessive fees and
> interest rates, lending without regard to borrowers' ability to repay,
> refinancing borrowers' loans repeatedly over a short period of time
> without any economic gain for the borrower, and committing outright
> fraud or deception.

(Id. at 4).  The DoD further recognized that vehicle title loans possess virtually all

of these predatory lending characteristics, and stated that "vehicle title loans should

be included within the definition of consumer credit, and that covering such

transactions is consistent with the law's purpose."  (Id. at 9).

23

Towards this end, the final regulations that became effective on October 1, 2007 defined the types of consumer credit transactions, creditors, and borrowers to which the MLA applied, and specifically intended the title loan products at issue in this case to be included.

> **Consumer credit** means *closed-end credit* offered or extended to a covered borrower primarily for personal, family or household purposes, as described in paragraph (b)(1) of this section . . . [and] means the following transactions:
>
> \*\*\*
>
> (ii) **Vehicle title loans**.  Closed-end credit with a term of 181 days or fewer that is secured by the title to a motor vehicle that has been registered for use on public roads and owned by a covered borrower, other than a purchase money transaction . . . .

32 C.F.R. 232.3(b)(2)(ii) (second emphasis added).

> **Closed-end credit** means consumer credit other than "open-end credit" as that term is defined in Regulation Z (Truth in Lending), 12 CFR part 226.

32 C.F.R. § 232.3(a).[10]

> **Creditor** means a person who is engaged in the business of extending consumer credit with respect to a consumer credit transaction covered by this part [which includes] any other business entity and who otherwise meets the definition of "creditor" for purposes of Regulation Z.

32 C.F.R. 232.3(e).[11]

---

[10] The Federal Reserve Board's Official Staff Interpretations to Regulation Z provide that "Pawn Transactions" are closed-end credit.  12 C.F.R. § 226, Supp. I(C)(18).

> Regulation Z means any of the rules, regulations or interpretations thereof . . . .  Words that are not defined in this regulation have the meanings given to them in Regulation Z (12 CFP part 226) . . . .

32 C.F.R. 232.3(i).  As it relates to the DoD concern to maintain *full legal recourse*, the MLA also provided Servicemembers and their families with important civil remedies:

> **(2) Preservation of other remedies.—** The *remedies and rights* provided under this section are *in addition to* and do not preclude any remedy otherwise available under law to the *person claiming relief under this section*, **including any award for consequential and punitive damages**.
>
> **(3) Contract void.—**Any credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract.
>
> **(4) ARBITRATION**.—Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made.

See 10 USC § 987(f)(2)-(4).

Significantly, in the implementing regulations, the DoD recognized that the MLA could be enforced through private litigation, criminal prosecution, or state regulatory agencies.  In fact, it wondered whether reliance on private litigants was sufficient to achieve the important aims of the MLA:

---

[11] The purpose of Regulation Z is to "promote the informed use of consumer credit by requiring disclosures about its terms and cost." 12 C.F.R. § 226.1(b).

The Department understands that the federal bank, thrift and credit union regulatory agencies have authority—derived from federal law unique to federally-regulated depository institutions—to enforce these rules with respect to the institutions that they supervise. However, the Department notes that this authority extends to a narrow category of depository institutions that it proposes to cover as ''creditors,'' but it does not extend to other creditors, such as nonbank lenders, that would also be covered creditors and that may be most likely to provide the types of consumer credit restricted by these rules. ***The Department is concerned that reliance solely on private litigation or criminal prosecution with respect to these other creditors may be insufficient to ensure uniform compliance with these rules with respect to all creditors***. The Department understands that the consumer credit covered in the regulation is primarily overseen by state regulatory agencies. Consequently, the Department has made contact with the state regulatory agencies to determine which states plan to enforce the regulation and to determine how best to work with all 50 states on enforcement.

(Doc. 126, Ex. 40 – Pg. 9).

In early 2013, Congress amended the MLA to clarify and enhance the provisions that were enacted in 2007. The preservation of remedies language contained in the 2007 version of the law was unchanged. See 10 USC § 987(f) (2013). Congress added a new civil liability section, which further defined the remedies available for a person bringing a claim under the MLA, including a minimum award of statutory damages in the amount of $500 for each violation and recovery of litigation costs and attorneys fees. 10 U.S.C. § 987(f)(5) (2013).

This same section also afforded lenders with the right to recover litigation costs for actions brought in bad faith, a bona fide error defense, and a statute of limitations defense. Id. The amendment also included, **for the first time**, the

administrative enforcement by select governmental agencies. 10 U.S.C. §

987(f)(6) (2013). The amendment applies to extensions of credit made on or after

January 2, 2013, the date of enactment of the National Defense Authorization Act

for Fiscal Year 2013, Pub. L. 112-239, Div. A, Title VI, § 662(c), 126 Stat. 1786

(Jan. 2, 2013). No fair reading of the MLA could find that no remedies existed for

private litigants before the passage of the 2013 Amendment. Servicemembers

have enjoyed the possibility of recovery of consequential and punitive damages,

the ability to void illegal contracts from their inception, and the avoidance of

arbitration since the MLA's original enactment.

## I.    THE DISTRICT COURT PROPERLY FOUND GOOD CAUSE EXISTED TO ALLOW RULE 23(B)(3) CERTIFICATION

The decision to seek leave to amend the Complaint to add an alternative claim

for certification under Rule 23(b)(3) was not, as Defendants suggest, an untimely

strategic decision. There is not a scintilla of evidence in the record that Plaintiffs

and their counsel have not been diligent in pursuing this case in accordance with

the requirements of the multiple Case Scheduling Orders entered in this case and

the district court made no findings in this regard. The decision to seek an

alternative form of class certification permitted by the rules was based on the

efforts that were made over the course of many months to collaboratively identify

the potential active duty and dependent class members through a comprehensive

comparison against the various DoD databases discussed *supra*, nine months ***after***

27

Plaintiffs filed their initial motion for class certification when Defendants requested a stay would afford the parties the opportunity to resolve this case by agreement. Further, the posture of the case presented a unique situation because extensive merits-based discovery had been completed and additional evidence was not required to evaluate the propriety of a certification under Rule 23(b)(3). As a result, the district court determined "good cause" existed to permit Plaintiffs to amend their complaint and class certification papers to seek certification under Rule 23(b)(2) or Rule 23(b)(3), or a hybrid of both. (Doc. 187 – Pg. 98-99).

In all cases, Rule 15(a) permits district courts to "freely give leave when justice so requires" and Rule 16(b)(4) gives district courts the discretion to modify any scheduling order for good cause. Particular to class actions, district courts are given the discretion to "determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument." Fed. R.Civ.P. 23(d)(1)(A). Additionally, it is well established that district courts have the "inherent power" to manage their own dockets and have the discretion to fashion orders to achieve judicial economies and the interests of justice. Sahyers v. Prugh, Holliday & Karatinos, P.L., 560 F.3d 1241, 1244 (11th Cir. 2009). These powers are not governed by rule or by statute "but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious

disposition of cases." Id. (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 82 S.

Ct. 1386, 1389 (1962)).

The term "discretion" means that a district court "has a range of choice, and that

its decision will not be disturbed as long as it stays within that range and is not

influenced by any mistake of law." Guideone Elite Ins. Co. v. Old Cutler

Presbyterian Church, Inc., 420 F.3d 1317, 1324-25 (11th Cir. 2005) (citations

omitted).

> The very concept of discretion presupposes a zone of choice within
> which the trial courts may go either way. . . . Thus, when employing
> an abuse of discretion standard, we will leave undisturbed a district
> court's ruling unless we find that the district court has made a clear
> error of judgment, or has applied the wrong legal standard.

Id. As this Court has repeatedly held that it will not reverse a district court's

*refusal* to allow an amendment absent an abuse of discretion (E.g., Sosa v. Airprint

Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998)), it must also not reverse a district

court's decision to allow an amendment under that same standard.

Here, the district court found good cause existed.  First, the court held good

cause existed because none of the parties argued that additional discovery was

necessary to support or oppose class certification under Rule 23(b)(3) and such a

decision could be based on the current record.  (Doc. 204 – Pg. 32).  Second, in

permitting the amendment, the district court specifically noted there would be no

prejudice because Defendants were aware from the beginning of the litigation that

Plaintiffs intended to recover interest that was unlawfully charged and collected.

(Id. at 33).  See also Dunbar v. Google, Inc., 5:12-CV-003305-LHK, 2012 WL

6202797, at *16 (N.D. Cal. Dec. 12, 2012) (granting leave to amend and finding no

prejudice because "the Court will not reopen class certification discovery").  The

district court held that "[w]hile the procedural rule under which Plaintiffs seek this

recovery may have changed, the substance of Plaintiffs' claims remains exactly the

same."  (Id.).  Because "Defendants acknowledge that the proposed amended

complaint is not driven by any new facts or evidence . . . , Defendants will not be

unduly prejudice . . . ."  George v. Gen. Motors Corp., 7:05-CV-1482, 2007 WL

2973589, at *2 (N.D.N.Y. Oct. 9, 2007) (allowing amendment to add certification

under (c)(4) class where discovery would be the same) (citations omitted); Scott v.

Family Dollar Stores, Inc., 733 F.3d 105, 118-19 (4th Cir. 2013) (granting leave to

amend class action complaint three years after filing and stating that "basis for a

finding of prejudice essentially applies where the amendment is offered shortly

before or during trial").

    Indeed, when the issue was discussed at the hearing, Defendants' counsel stated

"if your honor is to consider (b)(3), I would ask for an opportunity for Plaintiffs' to

file a new motion with a brief setting out what they want to do, with us having an

opportunity to then evaluate a (b)(3)."  (Doc. 187 – Pg. 68-69).  The court agreed.

Thus, Defendants were in no way prejudiced because they had the full opportunity

30

to provide argument against the motion and to recite any evidence garnered during discovery which they felt warranted denial of a Rule 23(b)(3) class.[12] Prejudice is also minimal due to the provisional nature of class certification:

> [B]ecause a court may revisit initial denials of certification, some courts make this explicit by denying certification with leave to amend, particularly when the defective class pleading has the potential of being corrected, while others have denied certification without prejudice to renew upon completion of certification discovery. Generally, only if it is clear that a class cannot be certified does a court deny certification with prejudice or without leave to amend.

3 NEWBERG ON CLASS ACTIONS § 7:33 (5th ed.).

The district court correctly exercised its discretion to permit Plaintiffs to seek certification under Rule 23(b)(3).

## II.    A PRIVATE RIGHT OF ACTION EXISTS UNDER THE MLA

### A. Private Right of Action Jurisprudence

A statute may create a private right of action either expressly or by implication. See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 15, 100 S. Ct. 242, 245 (1979).

First, rights-creating language in the statutory text would indicate Congress intended that a private right of action exists. Alexander v. Sandoval, 532 U.S. 275, 288, 121 S. Ct. 1511, 1521 (2001). "Rights-creating language" is language

---

[12] Significantly, Defendants made no formal request to engage in additional discovery in order to respond to Plaintiffs' Supplemental Motion for Class Certification and still have not clearly articulated what additional discovery would be necessary to fully respond to certification of a Rule 23(b)(3) class.

"explicitly confer[ing] a right directly on a class of persons that include[s] the plaintiff in [a] case," Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n.13, 99 S. Ct. 1946, 1954 n.13 (1979). Second, a private right of action should not be implied if the statutory structure provides a distinct enforcement mechanism. Sandoval, 532 U.S. at 290, 121 S.Ct. at 1521–22. Third, if the statutory text and structure have not conclusively resolved whether a private right of action should be implied, a court should turn to the legislative history and statutory context. Id., 532 U.S. at 288.

Finally, under binding Supreme Court precedent, when Congress declares in a federal statute that contracts are void, it intends that the customary legal incidents of voidness would follow. See Transamerica, 444 U.S. at 19, 100 S. Ct. at 247. In plain English, the word "void" means something, including the availability of a suit for rescission, restitution, or an injunction against continued operation of the contract. Id., 444 U.S. at 18-19.

## B. The 2007-MLA Provides for a Private Right of Action

### 1. Giving the Power to Void a Contract Creates a Private Right of Action

The MLA provides for a private right of action because the plain language of the statute provides for private rights and remedies. In a subsection entitled "Penalties and Remedies," Congress expressly provided three remedies to persons claiming relief under section (f): (1) recovering consequential and punitive

damages; (2) rendering non-compliant contracts void; and (3) banning arbitration for covered borrower disputes. See 10 U.S.C. § 987(f)(2)-(4) (2007). Former §(f)(3) provides that "[a]ny credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract." Id. Defendants' effort to erase binding Supreme Court precedent is unavailing. Anticipating the arguments Defendants would later make, the Transamerica court found:

> At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract. ***But the legal consequences of voidness are typically not so limited***. A person with the power to void a contract ordinarily may resort to a court to have the contract rescinded and ***to obtain restitution of consideration paid***.

> [W]hen Congress declared … that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution.

Transamerica, 444 U.S. at 18-19, 100 S. Ct. at 246-247 (emphasis added). Thus, asserting voidness is not merely a defensive remedy, as it allows the affirmative recovery "of consideration paid," (i.e., the return of money wrongfully paid). Regardless of the labels preferred by Defendants, this right for affirmative relief is more than a true "defense."

  "[A] defense, which is offered and alleged by the [defendant] as a reason in law or fact why the plaintiff should not recover or establish what he seeks [or is] put

33

forward to diminish plaintiff's cause of action or defeat recovery, is quite different

from a claim, which is essentially an action which asserts a right to payment." <u>Am.</u>

<u>First Fed., Inc. v. Lake Forest Park, Inc.</u>, 198 F.3d 1259, 1264 (11th Cir. 1999)

(finding that counterclaims are different than defenses) (citations omitted).

Ultimately, not only does <u>Transamerica</u> provide a private right of action, but it also

makes clear that those who were victims of a voidable contract can enjoy a

remedy.[13]

### 2. The Savings Clause Recognizes the Creation of Remedies and Rights

Next, former 10 U.S.C. § 987(f)(2) enumerates "remedies and rights" that a

person may use to claim relief. These "remedies and rights provided under this

---

[13] Contrary to Defendants' assertions, (<u>see</u> Br. of Appellants 37), restitution can be compatible with class relief. "[R]estitution may be coupled with injunctive relief in a Rule 23(b)(2) action." <u>DeHoyos v. Allstate Corp.</u>, 240 F.R.D. 269, 285 (W.D. Tex. 2007) ("When monetary relief is properly sought as equitable restitution, such cases qualify as Rule 23(b)(2) classes. . . ") (citing, *inter alia*, 2 NEWBERG ON CLASS ACTIONS § 4:14 (4th ed. 2002)). Additionally, as discussed more fully in the predominance section *infra*, the uniform principles of unjust enrichment make that claim available for class-wide relief.

Finally, the Defendants' suggestion that no classable remedy could be proper under <u>Transamerica</u> is incorrect, because if a private right of action is judicially implied, a court "has a measure of latitude to shape a sensible remedial scheme that best comports with the statute." <u>Liese v. Indian River Cnty. Hosp. Dist.</u>, 701 F.3d 334, 347 (11th Cir. 2012) (quoting <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 118 S. Ct. 1989 (1998)). Considering the vital purposes of the MLA with ensuring military readiness, a court could fashion meaningful class-wide relief.

section *are in addition to*, and do not preclude, any remedy otherwise available under law to the person claiming relief under this section, including any award for consequential or punitive damages." (emphasis supplied).

Because this clause acknowledges that the MLA added "rights and remedies," this clause is fundamentally different than the savings clauses cited by Defendants. For instance, the court in <u>Or. Natural Res. Council v. U.S. Forest Serv.</u>, examined the savings clause of the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(e). 834 F.2d 842, 851 n.15 (9th Cir. 1987). That clause stated "that nothing in that provision 'shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief.'" <u>Id.</u> <u>See also</u> <u>In re Mexico City Aircrash of October 31, 1979</u>, 708 F.2d 400, 407 (9th Cir. 1983) ("Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the ***provisions*** of this chapter are in addition to such remedies.") (quoting 49 U.S.C. § 1506 (1976)) (emphasis added). But here, by acknowledging that the MLA created remedies and rights, the savings clause does indeed "evidence [a] positive intent to create a private cause of action*."* <u>In re Mexico City Aircrash</u>, 708 F.2d at 407.

In contrast with Defendants' authority, the SCRA contains a savings clause materially similar to the MLA's:

**(2) Preservation of other remedies**

The remedy and rights provided under this section are in addition to and do not preclude any remedy for wrongful conversion otherwise available under law to the person claiming relief under this section, including any consequential or punitive damages.

See Linscott v. Vector Aerospace, CV-05-682-HU, 2006 WL 240529, at *7 (D. Or., Jan. 31, 2006). Courts have consistently found a private right of action under the SCRA (which is at least as analogous to the MLA as the Truth in Lending Act ("TILA")). See Jimenez v. Miami-Dade Cnty., 11-23131-CIV, 2013 WL 214673, at *7 (S.D. Fla., Jan. 18, 2013) ("most federal courts examining whether particular provisions of the SCRA provided an implied private right of action had concluded that they did"); Gordon v. Pete's Auto Serv. of Denbigh, Inc., 838 F. Supp. 2d 436, 445 (E.D. Va. 2012) (collecting cases).

### 3.  The Arbitration Clause Reinforces the Private Right of Action

The MLA's clause prohibiting arbitration is yet more evidence in the plain text that the MLA created remedies and rights. Defendants claim that this clause somehow "extinguished rights," and that it only reinforced that "the defense [of voidness] will be determined in court, not arbitration." (Br. of Appellants 27). Of course, this theory would require the Court to completely disregard the analysis from Transamerica that a party seeking to void a contract has affirmative rights. Cutting through Defendants' implausible arguments below, the trial court noted that "[s]uch a provision would not be necessary if there were no private right of

action under the MLA." (Doc. 204 – Pg. 10). The provisions stating that the contracts are void and that arbitration is unenforceable are both clearly contained in the section providing for remedies for Servicemembers, and the Court should decline to transform those remedies into "defenses."

For these reasons, the first prong from <u>Sandoval</u> has been met because Congress clearly contemplated that a person could claim relief under the penalties and remedies section.

## C. No Comprehensive Enforcement Scheme Exists

Even if the Court determines that these remedies and rights were not expressly created by Congress, the implication is inescapable. The trial court found that "[i]t is also significant that unlike the statutes in <u>Sandoval</u> and <u>Love</u>, the pre-2013 MLA does not establish an administrative enforcement regime." (Doc. 204 – Pg. 11). The lack of authority of the Consumer Financial Protection Bureau ("CFPB") and other federal banking agencies to enforce the MLA (and the 2013 Amendment's lack of retroactivity) strongly indicate that no administrative agency had enforcement authority under the original version. 72 Fed. Reg. 50,590. Although a criminal complaint could be filed, Congress did not erase the rest of the rights-creating language contained in § 987(f) as described above.

## D. The Legislative History Supports a Private Right of Action

Third, the legislative history and statutory context indicate that Congress

37

intended that the creation of private rights and remedies.  The DoD requested that Congress ensure that "[l]oan contracts to Service members … not include mandatory arbitration clauses…"  (Report on Predatory Lending Practices Directed at Members of the Armed Forces and their Dependents, Doc. 122-3 – Pg. 12).  This was important so that "the Service member [should not be required] to waive his or her right of [full legal] recourse, such as the right to participate in a plaintiff class."  Id.  Congress obliged.

Also, the DoD recognized that the MLA did not provide explicitly for enforcement beyond criminal penalties and the remedy of voiding an offending contract.  The DoD expressed its concern "that reliance solely on private litigation or criminal prosecution with respect to these other creditors may be insufficient to ensure uniform compliance with these rules with respect to all creditors."  72 Fed. Reg. 50580-01.  Hence, the DoD assumed that Congress created a private right of action to covered borrowers both before and after the passage of the Act.

Defendants wrongly place emphasis on the 2013 Amendment to the MLA.  While enhancing the available remedies, it cannot change Congress's original intent.  See United States v. Jordan, 915 F.2d 622, 627 (11th Cir. 1990) ("The fact that Congress codified a preexisting remedy, however, does not, by itself, stand for the proposition that Congress also implicitly intended to circumscribe other available, preexisting statutory remedies.").  Moreover, Defendants err when

presupposing that the Amendments created a bona fide error defense that was allegedly unavailable before the Amendments.  As the district court noted (while adopting Defendants' arguments regarding class certification), the original MLA only penalizes creditors who knowingly violated the Act.  (Doc. 204 – Pg. 36).  The original MLA similarly contained the "careful balancing" contained in the Amendments, as the implementing regulations created a safe harbor provision for lenders who asked borrowers to complete a "Covered Borrower Information Statement" ("CBIS") disclaiming their military status.  (Doc. 204 – Pg. 36).  Given the actions of Congress in relation to the requests of the DoD and the contemporary understanding of the DoD, this factor tilts toward a private right of action.

## III.    THE DISTRICT COURT IDENTIFIED COMMON CLAIMS, ISSUES, AND DEFENSES

Telling in this case is that Defendants devote only slightly more than a single page supporting their argument on appeal that the district court did not sufficiently identify common claims, issues, and defenses.  When the district court's written order and the content of the hearing transcript are considered, this argument is due to be rejected.

Rule 23(c)(1)(B) provides: "An order that certifies a class action must define the class and the class claim, issues, or defenses, and must appoint class counsel

39

under Rule 23(g)."[14]  To this end, both the order granting class certification and the transcript of the hearing are replete with the district court's analysis of the common claims, issues, and defenses asserted in this case that enable this Court to determine there was no abuse of discretion.  See Blum v. Bacon, 457 U.S. 132, 138, 102 S. Ct. 2355 (1982) ("It is well accepted, however, that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below.") (citations omitted); Shahriar v. Smith and Wollensky Rest. Gp. Inc., 659 F.3d 234, 252 (2d Cir. 2011) (considering written order and transcript together).

    First, the Order: The district court issued a forty-seven page opinion in this case which defined the class.  (Doc. 204 – Pg. 46.)  The Order identifies the allegations of Plaintiffs' claims and their contentions as to how Defendants violated the law by making loans that did not comply with the requirements of the MLA.  (Id. at 1-3). The first half of the order addresses the common defenses asserted in opposition to class certification and analyzes their applicability regarding the propriety of summary judgment.  (Id. at 1-28).  Very mindful that Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage," the district court noted that the present case has a different posture because, by

---

[14] Although the district court's order did not appoint class counsel, Defendants never claimed that class counsel did not satisfy the requirements of Rule 23(g). Accordingly, the remedy to correct any defect in this regard is to remand the case with instructions to consider Rule 23(g) in appointing class counsel.

40

consent, the parties engaged in merits-based discovery and that the case scheduling order resulted in motions for class certification and summary judgment being ripe at the same time.  (Id. at 4).

As more fully discussed in the following section of this Brief, a primary defense common to all class member claims under Count II (Violation of the MLA) was whether the MLA authorized a private right of action.  The district court expressly noted "[t]his question is inextricably intertwined with the question whether there are common issues of law for class adjudication"  (Id. at 5).  The district court found a private right of action after an extensive analysis.  (Id. at 5, 17).  Based on the exemplar contracts presented for interpretation, the district court also concluded that Defendants' defenses based on conflicting state law were preempted and that the transactions sued upon were "consumer credit" transactions within the meaning of the MLA.  (Id. at 20).  Based on this conclusion, the district court held that "any corresponding argument that these claims are not suitable for class certification is rejected."  Id.[15]

Second, the transcript of the hearing:  To claim that the district court did not make a rigorous analysis of the claims, issues, and defenses pertinent to class

---

[15] Defendants are not heard to argue that the district court's grant of summary judgment in their favor and concomitant denial of class certification for the RICO claims is erroneous and lacks the proper and rigorous analysis necessary to support the district court's rulings Defendants deem beneficial.

certification wholly ignores the 114-page transcript where these issues were

extensively discussed.  (November 20, 2013 Tr., Doc. 187).  During the hearing,

Judge Land was certainly not a passive jurist idly observing the parties'

contentions.  To the contrary, just his comments and questions during the hearing

take up take up more than 1,000 lines (or forty pages) of the 114-page transcript.

(Id.).  Further, the transcript clearly reflects that Judge Land was very

knowledgeable of the issues and arguments advanced by the parties and had

obviously spent a great deal of time familiarizing himself with the pertinent issues

prior to calling the proceedings to order.  Defendants' arguments to the contrary

should be summarily rejected by this Court.

## IV.    COMMONALITY AND TYPICALITY

When discussing commonality, Defendants focus on the concluding section of

the Order in an effort to suggest that the trial court lazily recited the elements for

class certification without examining the common issues.  (Br. of Appellants 41).

Yet, later, Defendants criticize the trial court for examining the common issues in

too much detail.  (Br. of Appellants 47).  Such conflicting claims contravene the

abuse of discretion standard implicit in this Appeal.  See Hines, 334 F.3d at 1257

("[O]ur review of a district court's . . . class certification order is only for abuse of

discretion; whether, in reviewing the record de novo, we would certify the class is

of no consequence. . . . Abuse of discretion review allows for 'a range of choice for

42

the district court, so long as that choice does not constitute a clear error of judgment.'") (citations omitted).

When convenient, Defendants ignore the first forty-four pages of the Order, which exhaustively analyze both the merits of the claims (Defendants had filed a motion to dismiss and two motions earlier seeking at least partial summary judgment) and the class certification. As the trial court noted, "some merits-based issues are inextricably intertwined with Plaintiffs' class certification motions." (Doc. 204 – Pg. 4).

The trial court thus did identify common questions, even labeling them as entire sections in its comprehensive Order. The first common question is Section I(A), entitled: "Does the Pre-2013 MLA Authorize a Private Right of Action?" (Doc. 204 – Pg. 5). The trial court explicitly stated that "[t]his question is inextricably intertwined with the question whether there are common issues of law for class adjudication . . . ."[16] The trial court found that the answer to that common question

---

[16] The Order also lays bare the hollow nature of Defendants' complaints about "going too deep into the merits":

> [I]n the present case, some merits-based issues are inextricably intertwined with Plaintiffs' class certification motions. Moreover, due to the nature of the issues presented by the motions for class certification, the [c]ourt, with the consent of the parties, permitted class certification discovery and some merits discovery to proceed simultaneously in an attempt to maximize judicial economy. This scheduling approach resulted in motions for class certification and summary judgment becoming ripe at the same time. Therefore, no

43

(subject to a common defense) was yes.  The trial court explicitly noted that it "thus rejects this argument for denial of class certification." (Doc. 204 – Pg. 12). At a minimum, this is an explicit recognition of a common question, with a common answer to a common claim.

Next, the court asked: "Are Plaintiffs' Transactions Covered by the MLA?" (Doc. 204 – Pg. 12).  After another extensive analysis, the trial court found that the answer to that common question (subject to a common defense) was also yes.[17] The trial court's analysis on this question shows why this is a common issue subject to common resolution. The trial court saw through the supposed state-law distinctions advanced by Defendants, finding that:

> If the MLA defined "consumer credit transaction" by deferring to state law definitions of those terms, then Defendants' arguments

party is prejudiced in any way by the [c]ourt's consideration of merits-based issues in its evaluation of class certification.

(Doc. 204 – Pg. 4).  Indeed, Defendants explicitly invited the merits below:

> That single legal issue has the potential to resolve most of the claims in this case, as Plaintiffs' early visions of a massive nationwide class have come to naught in the face of uncontroverted proof that Defendants have followed an MLA compliance policy. . . . Discovery having served its purpose, this case is now ripe for summary judgment for Defendants.

(Doc. 184 – Pg. 1).

[17]  The district court had previously addressed, analyzed, and discussed applicability of the MLA at length when evaluating the merit of Defendants' Motion to Dismiss.  (See Doc. 55).

44

would be more persuasive. But that is not how the MLA defines covered transactions, and ***significantly, the MLA preempts state law that is inconsistent with the MLA.***

. . .

What matters is that, based on the present record, the named Plaintiffs deposited a vehicle title with a Defendant as security for the payment of a debt. If a specific sum of money is not paid, then the Plaintiff loses the title to the car, as well as the car itself. Even though these transactions may not be considered "credit' transactions under state law, the [c]ourt finds that they are "consumer credit" transactions within the meaning of the MLA. Accordingly, to the extent that Defendants seek summary judgment as to these claims, that motion is denied, ***and any corresponding argument that these claims are not suitable for class certification is rejected***.

(Doc. 204 – Pg. 20) (emphasis added).

For all of its thoroughness, the Brief of Appellant makes no real effort to argue how the preemptive effect of this federal law does not create common issues and common defenses. Even worse, Defendants ignore the trial court's explicit finding about the appropriateness of class certification under that reasoning. That the common answer was not the one which Defendants hoped for does not mean it does not exist.

On the issue of commonality, Defendants are in a quandary: they know that the transactions at issue all run afoul of a federal statute which preempts their state-law defenses. The only way to muddle the commonality is to point to arcane differences in the various state law schemes that call the transactions something else, however ineffectual these differences are rendered under the MLA. But

having muddled the common issues with a convoluted merits-based analysis, Defendants now must criticize the trial court for seeing through the differences.

Below, Defendants eagerly anticipated inquiry into the merits, as evidenced by their braggadocio that "[d]iscovery having served its purpose, this case is now ripe for summary judgment for Defendants." (Doc. 184 – Pg. 1).  Only after the court denied summary judgment on some claims do Defendants argue it was abuse of discretion for the district court to examine the merit of its defenses.  Inviting and requiring inquiry into the merits, and then complaining about the "improper procedures" resulting from the inquiry, (Br. of Appellants 50), is not a viable strategy.  Instead, it strongly reinforces the trial court's conclusion that the merits—based on Defendants' arguments of the MLA's impotence in the face of various state law schemes—are inextricably intertwined with questions of class certification.

The root of the problem for Defendants is that the transactions at issue in this case are fundamentally similar and are thus susceptible to class-wide resolution.  Form contracts—such as the ones at issue here—readily satisfy the predominance requirement.[18]  For common questions to predominate, the contracts need not be exactly the same but should be "materially similar." Sacred Heart Health Sys., Inc.

---

[18] Cf. Plaintiffs' exemplar transactions in Doc. 126 (*supra*) with other exemplar transactions (Doc. 126, Ex. 30-36).  See also Saunders Report (Doc. 126, Ex. 28).

v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1171 (11th Cir. 2010).
That is the case here.

All the essential terms are the same: in every transaction, Defendants imposed
annual percentage rates of interest that exceeded thirty-six percent and required
borrowers to pledge the title to a motor vehicle as security for the obligation for a
term of 181 days or less.  (Doc. 126, Ex. 37; Doc. 126, Ex. 28 – Pg. 3, 6, 11).
Additionally, through the expert report of Margot Saunders, Plaintiffs provided a
comprehensive analysis of the transactions at issue in this case, describing how
there are virtually no substantive differences between the transactions entered in
the "Title Pawn," "Pledge Title," or "Title Loan" states.  (Doc. 126, Ex. 28 – Pg. 9-
14, 19-21).  The same business practices (through Defendants' ELMS computer
program) control regardless of the jurisdiction.  (Doc. 126, Ex. 37).

Similarly, the trial court found that all the transactions were governed by the
MLA due to their inherent similarity.  "The present record likewise establishes that
Defendants recognized that 'pawn transactions' are a type of 'closed-end credit
transaction' within the meaning of [the Truth in Lending Act], which has the same
definition of 'closed-end transaction' as the MLA."  (Doc. 204 – Pg. 20 n.7).
Moving on to the pledge jurisdictions, the trial court found that "[e]ven if such
non-recourse loans are not considered 'credit' transactions under state law, the
[c]ourt finds that these title loans are 'consumer credit' transactions within the

meaning of the MLA, and the 'title pledge' putative class members should not be excluded from the class.'" (Doc. 204 – Pg. 42). Just as the borrowers in the pawn states, the borrowers in the title pledge jurisdiction will lose the car title and the car if they do not repay as part of the transaction. (Doc. 204 – Pg. 42). Finally, the district court found that the MLA likely rendered distinctions under Texas law a nullity as well because credit service charges "clearly [fall] within the definition of military annual percentage rate" under the MLA. (Doc. 204 – Pg 44). And further, the actions of one of Defendants recognized the preemptive nature of the federal statutes: "Texas Car Title evidently believed that it could be considered a creditor within the meaning of Regulation Z: it made the required Truth in Lending disclosures in the Texas Exemplar Contract." (Doc. 204 – Pg. 45).

The trial court's analysis showed that, regardless of the jurisdiction, the contracts were indeed materially similar. Because Defendants' arguments regarding the alleged need for additional subclasses (and typicality) rests upon "account[ing] for material variations," (Br. of Appellants 49) and because the Order showed there are no material variations, the trial court's finding of commonality was satisfied.

## V. EXPRESS REQUIREMENTS OF RULE 23(B)(3)

Defendants' arguments in sections V and VI concern the two express requirements of Rule 23(b)(3): predominance and superiority. (Br. of Appellants

48

52-60).  Defendants ask this Court to consider the district court's Order in a

vacuum and completely nullify "the awesome power of a district court . . . ." Klay

v. Humana, Inc., 382 F.3d 1241, 1251 (11th Cir. 2004), abrogated in part on other

grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131

(2008).  However, as the district court pointed out, its Order was in fact the result

of "the parties' extensive filings in this case and hearings that the [district] [c]ourt

[] conducted . . . ."  (Doc. 204 – Pg. 35).

Defendants would have this Court reverse and vacate the Order because it does

not contain magic words.  But a district court is not required to "utilize any

particular verbal formula, nor that the district court make express findings on each

[Rule 23(b)(3)] requirement."  Shahriar, 659 F.3d at 252.  See also Vega, 564 F.3d

at 1278 (stating that a district court may "engage in a predominance assessment

_sub silencio_ in other parts of its order").

## A. Predominance

A fair reading of the Order shows that the court engaged in a rigorous analysis

of the predominance requirement.  First, the Order rejected a putative class of

plaintiffs who executed a negative CBIS.  (Doc. 204 – Pg. 38-39).  For those

individuals whose loan files contained additional documentation that would have

given Defendants knowledge that the individuals were in fact covered borrowers,

the court noted the heavy burden of conducting person-by-person findings of fact to determine if they are in fact a covered borrower.  Thus, the court held:

> In light of the conflicting information, it would be necessary to determine for each potential Plaintiff whether the Defendant may rely on the CBIS safe harbor. . . . Based on these significant individualized determinations, the Court finds that Rule 23(b)(3)'s predominance requirement is not met for putative plaintiffs who executed a negative CBIS.

(Doc. 204 – Pg. 38-39).

The court's predominance analysis for the rejected individuals *ipso facto* establishes the court's engagement in a rigorous analysis of the predominance requirement.  To do so, the court articulated the law regarding the predominance requirement.  (Doc. 204 – Pg. 37-38).  Next, the court applied that law to the putative class members, expressly rejecting those executing a negative CBIS.  (Doc. 204 – Pg. 38-39).  Finally, the court relied on this exclusion to determine the predominance of common issues for the remaining putative plaintiffs.  (Doc. 204 – Pg. 45).  After reading the court's analysis of predominance for the negative-CBIS individuals, it becomes clear how the court concluded that "[q]uestions of law and fact common to the class clearly predominate over individual issues."  (Doc. 204 – Pg. 45).

In addition to the court's three-and-a-half-page examination of the CBIS individuals, the court further analyzed whether differences in state law would preclude a coherently defined class.  (Doc. 204 – Pg. 39-45).

50

> In a multi-state class action, variations in state law may swamp any common issues and defeat predominance. Accordingly, a district court *must* consider how variations in state law affect predominance and superiority. A requirement that a court know which law will apply before making a predominance determination is especially important when there may be differences in state law.

Stirman v. Exxon Corp., 280 F.3d 554, 564 (5th Cir. 2002) (emphasis added) (citations and internal punctuation omitted).  The court used six pages of its Order to analyze the competing state laws and held that because of the preemptive nature of the MLA, the common questions of law and fact predominate over any state differences regarding the name of the financial product.  (Doc. 204 – Pg. 36-45).

In so doing, the trial court implicitly (and necessarily) rejected the Defendants' arguments concerning various states application of the voluntary payment doctrine. Because of the preemptive nature of the MLA, the common questions of law and fact predominate over any state's application of the voluntary payment doctrine. Cf. Gonzalez v. Codilis & Associates, P.C., 03 C 2883, 2004 WL 719264 (N.D. Ill. Mar. 31, 2004) (interpreting similar preemption clause of Fair Debt Collection Practices Act, holding that "because the Voluntary Payment Doctrine provides less protection to consumers than the FDCPA, it is preempted.").  See also Abby v. Paige, 10-23589-CIV, 2013 WL 141145, at *9 (S.D. Fla., Jan. 11, 2013) ("FDCPA is a federal law and accordingly state law defenses are not relevant here"); Cappetta v. GC Servs. Ltd. P'ship, 654 F. Supp. 2d 453, 464 (E.D. Va. 2009).

Further, any individualized questions of damages do not predominate where, as here, the damages are readily calculable—not that individualized damages should prevent certification anyway.  Cf. 2 NEWBERG ON CLASS ACTIONS § 4:54 (5th ed.) (quoting Allapattah Servs. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir.2003)) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").  Indeed, the damages implicated in this case are well-suited for class treatment.  This Court has recognized that "[i]n cases involving damages that may be calculated by a reliable formula—such as overcharge cases or usury cases—damages are not much of a hurdle at all to certification."  Sikes v. Teleline, Inc., 281 F.3d 1350, 1365 n.40 (11th Cir. 2002), abrogated on other grounds by Bridge, 553 U.S. 639.

Nor does the nature of the relief (suggested by the district court as unjust enrichment) strip away the predominance of common issues.  To the contrary, numerous courts have found that claims for unjust enrichment are amenable to class treatment.  See, e.g., Cnty. of Monroe, Fla. v. Priceline.com, Inc., 265 F.R.D. 659, 671 (S.D. Fla. 2010).  The concerns expressed in Vega are inapplicable where "it is undisputed that Defendants' business operations are the same as to all members of the putative class."  Id.  The fact that the Class seeks relief for a nationwide class does not unduly complicate matters.  "Breach of contract and

unjust enrichment, are universally recognized causes of action that are materially the same throughout the United States." Singer v. AT&T Corp., 185 F.R.D. 681, 692 (S.D. Fla. 1998) (citing Am. Airlines v. Wolens, 513 U.S. 219, 233, 115 S. Ct. 817, 826 n. 8 (1995). See also In re Checking Account Overdraft Litig., 286 F.R.D. 645, 658-59 (S.D. Fla. 2012) ("courts often certify unjust enrichment claims because 'common questions predominate' and are 'all easily resolved class wide.'") (citations omitted).

The court engaged in an analysis of predominance factors across at least ten pages of its comprehensive Order. For Defendants to allege that this analysis was not rigorous merely because the court did not use some magic word or phrase is simply disingenuous, especially considering that Defendants also criticize the court for exercising too much rigor in examining variations across state law. (Br. of Appellants 47-50). The district court acted well within its discretion when it found the predominance of these common issues.

## B. Superiority

The inquiry into predominance informs the question of superiority.

> In many respects, the predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiff's claims.

Klay, 382 F.3d at 1269 (citations omitted). Because this is a consumer class action lawsuit involving relatively small loan amounts, it is by nature a superior method of litigation. Class actions "[aggregate] the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." Sacred Heart, 601 F.3d at 1183-84. This sentiment reflects Rule 23(b)(3)(A), which probes the class members' interests in individually controlling the prosecution or defense of separate actions. According to the Defendants' calculations, only a few class members would have damages exceeding $5,000 (excluding repossessions). (Doc. 191 – Pg. 20; Doc. 176, Ex. A). Other accounts involve much lower figures, making class resolution an obviously superior method. See 7A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 1779 (3d ed.) ("[superiority] requirement has been found to be satisfied in . . . suits seeking damages for . . . challenging interest rates as usurious . . . ."). See also Upshaw v. Ga. Catalog Sales, Inc., 206 F.R.D. 694, 701 n.2 (M.D. Ga. 2002) (noting that usury cases often meet 23(b)(3) requirements).

Defendants suggest that the court's Order is insufficient because it did not specifically address the four factors listed in Rule 23(b)(3). (Br. of Appellants 57). However, as this Court has previously noted (even in the midst of a particularly harsh review of a class certification order):

> [A]lthough the factors listed . . . are important and generally should inform courts' analysis, . . . consideration of every factor listed . . . is

54

[not] strictly mandatory in every case. . . . [I]t is enough to observe
that a complete failure to address these factors or any other pertinent
consideration when conducting a Rule 23(b)(3) inquiry is an abuse of
discretion.

Vega, 564 F.3d at 1278 n.19.

While the district court may not have labeled its discussion to the liking of

Defendants, the district court did indeed address "pertinent considerations" in its

inquiry; namely, the listed factor of manageability.  First, in addressing whether

good cause existed for Plaintiffs to amend their complaint, the court noted that no

need existed to extend discovery in the case due to the fact that "Defendants have

been aware since the beginning of this litigation that Plaintiffs seek to recover

interest which they content was unlawfully charged and collected by Defendants."

(Doc. 204 – Pg. 32).  Despite the change in procedure, the court found "the

substance of Plaintiffs' claims remains exactly the same."  (Doc. 204 – Pg. 33).

Second, the court's previously described analysis of the competing state laws in

this case constituted a valid analysis of the manageability factor.  Although—

contrary to what Defendants would suggest—Plaintiffs are not required to present

the district court with a trial plan, "courts must consider how a case will be tried as

part of the superiority assessment."  Vega, 564 F.3d at 1278-79 n.20 (citing

Robinson v. Tex. Auto. Dealers Ass'n, 387 F.3d 416, 425 (5th Cir. 2004)).  As

cited supra, the Fifth Circuit, among others, has pointed to the impact that state law

variations can have on management of a multi-state case.  See, e.g. Stirman, 280

55

F.3d at 564; <u>Sullivan v. DB Invs., Inc.</u>, 667 F.3d 273 (3d Cir. 2011); <u>Mullen v.</u>

<u>Treasure Chest Casino, LLC</u>, 186 F.3d 620, 627 (5th Cir. 1999).  Even though it

was not labeled as such, and despite its overlap with other requirements and factors

the court considered, the court's state law analysis was a clear example of the court

engaging in an analysis of how it would handle a class action involving one federal

statute that implicated numerous state laws.

## VI.    THE CLASS IS ASCERTAINABLE

As their last argument in challenge to the district court's decision to certify this

case, Defendants claim certification was improper because Plaintiffs admitted that

"it's going to be harder to identify who the dependants are . . . ."  (Br. of

Appellants 61).  Though it is more difficult to identify the military dependents

because Defendants did not check their military status against the MLA database

available when making the loan, that fact does not make the class unascertainable.

Even a cursory view of the record establishes that extensive progress was made

towards collaboratively developing a reasonable and reliable way to identifying

class members, including potential dependants.  As the district court noted, "there

is little mystery about who Plaintiffs seek to include in the proposed class."  (Doc.

204 – Pg. 35).

Though complaining it was error, throughout their argument, Defendants

neglect to mention that they agreed there were two electronic DoD databases

operated and maintained by the Defense Manpower Data Center ("DMDC") (available at https://www.dmdc.osd.mil/appj/dwp/index.jsp) that can be and were used to identify potential class members.  Both of these databases were specifically created by the DoD so that creditors have a means of determining the military status of customers before the transaction is consummated in order to comply with certain federal laws, like the MLA.  (See Doc. 122, Ex. 41 – Pg. 8, 11).

Defendants also ignore that since July 2012, Plaintiffs have argued that utilization of these databases will adequately identify virtually all of the potential class members in this case, including dependents.  As set forth in a letter by the DoD's Human Resources Activity Headquarters, the SCRA and MLA databases and will provide the most accurate means of identifying class members among the eighteen jurisdictions implicated by this action.  (Doc. 103, Ex. A).  But to avoid the certainty of Plaintiffs' motion to compel disclosure of all 4,123,000 transactions contained within Defendants' electronic database, and facing the possibility of a manual comparison of their database list with the information contained in the military databases, Defendants stipulated that "**the parties believe they have jointly developed the most efficient and practical means of identifying those borrowers potentially covered by the MLA**."  (Doc. 127.  See also Doc. 128 (Order staying case to allow parties to identify potential class members)).

57

This identification was accomplished by utilizing the SCRA database to electronically identify customers with a confirmed active duty military status, and then cross-referencing the addresses of activity duty customers to identify the potential military dependant customers residing at the same address.  Additionally, Defendants agreed to perform electronic searches through their customer database by using various key search terms unique for military borrowers (e.g. "Army", "Navy", "Marines", etc.), and further agreed to perform various Zip Code searches unique to, or in close proximity to military housing installations and housing communities.  This search criteria and methodology, which Defendants agreed was "the most efficient and practical means of identifying [dependent] borrowers", showed that there were 2,461 potential class members with an active duty status, and at least 2,597 potential class members with a military dependent status, who engaged in title loan, title pledge, or title pawn transactions with any of the Defendants in the eighteen jurisdictions at issue in this case.  (Doc. 131 – Pg. 1-2, ¶¶ 2(a), (b).  See also Doc. 187 – Pg. 102-110).  It was on this evidence, its analysis, and its discussion at the hearing (along with Defendants' agreement that the use of such electronic data) that the district court specifically recognized and held "the class is ascertainable because the parties have determined a way to identify covered borrowers who entered a vehicle title loan transaction during the relevant timeframe."  (Doc. 204 – Pg. 45).

58

Finally, in its class certification order, the district court has set a timeframe for the parties to submit a proposed Amended Scheduling and Discovery Order that includes a timeline for class notice and any additional proceedings.  (Doc. 204 – Pg. 47).  Since we have already identified at least 2,641 active duty servicemembers (with their address), it is reasonable to presume that dependents will reside at many of the same addresses as well.  Further, in conjunction with the computer searches for military dependants, it is reasonable to presume that direct-mail and published Notice of the pendency of this class action—sent to the addresses of the 2,597 potential dependents that have already been potentially identified in this case—will provide a means of confirming and verifying (through the electronic military databases) whether such dependants are "covered borrowers" under the terms of the MLA.  The class of dependents is ascertainable and, for the most part, has already been ascertained.  Accordingly, Defendants' argument of unascertainability should be rejected.

## CONCLUSION

For all the foregoing reasons, with the exception of not appointing class counsel, the district court's class certification meets or exceeds all the requirements set forth in Federal Rules of Civil Procedure.  It is due to be affirmed.  Regarding the appointment of class counsel, the remedy is to provide instructions for the court to consider such an appointment under Rule 23(g).

Respectfully submitted this 17th day of September, 2014.

BARNES LAW GROUP, LLC

/s Roy E. Barnes
Roy E. Barnes
Georgia Bar No. 039000

/s John R. Bevis
John R. Bevis
Georgia Bar No. 056110

/s J. Cameron Tribble
J. Cameron Tribble
Georgia Bar No. 754759

31 Atlanta Street
Marietta, Georgia 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373

roy@barneslawgroup.com
bevis@barneslawgroup.com
ctribble@barneslawgroup.com

*Attorney for Plaintiffs/Appellees*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 13,901 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman.

This 17th day of September, 2014.

/s Roy E. Barnes_____
Roy E. Barnes
Georgia Bar No. 039000

/s John R. Bevis_____
John R. Bevis
Georgia Bar No. 056110

/s J. Cameron Tribble_____
J. Cameron Tribble
Georgia Bar No. 754759

BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, Georgia 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373

*Attorney for Plaintiffs/Appellees*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs/Appellees hereby certifies that this

day he caused the foregoing **BRIEF OF APPELLEES** to be served on all parties

by means of the Court's ECF system on all registered participants and by

depositing a service copy of same in the United States Mail with sufficient postage

paid to ensure First Class delivery to the following counsel of record:

Stephen M. Forte, Esq.
Edward H. Wasmuth, Jr., Esq.
David C. Newman, Esq.
Colin R.P. Delaney, Esq.

SMITH GAMBRELL & RUSSELL, LLP
Promenade, Suite 3100
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592
sforte@sgrlaw.com
ewasmuth@sgrlaw.com
dnewman@sgrlaw.com
cdelaney@sgrlaw.com

The undersigned counsel further certifies that this day he caused the

foregoing **BRIEF OF APPELLEES** to be filed with the Clerk of Court using the

Court's ECF system, with seven paper copies contemporaneously dispatched via

FedEx for next-day delivery and filing with the Clerk at the below address:

John Ley, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

1

This 17th day of September, 2014.

/s Roy E. Barnes_____
Roy E. Barnes
Georgia Bar No. 039000

/s John R. Bevis_____
John R. Bevis
Georgia Bar No. 056110

/s J. Cameron Tribble_____
J. Cameron Tribble
Georgia Bar No. 754759

*Attorneys for Plaintiffs/Appellees*

BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, Georgia 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373
Email: bevis@barneslawgroup.com